[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14594
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 30, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00105-CR-FTM-29-DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHARON JOHNSTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 30, 2009)

Before BLACK, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

The Controlled Substances Act ("CSA"), 21 U.S.C. § 841, prohibits

dispensing controlled substances, unless prescribed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Dr. Sharon Johnston was convicted for illegally dispensing: Oxycodone (the generic name for Roxicodone) and Alprazolam (the generic name for Xanax) (Count 1); Oxycodone (Count 2); Alprazolam and Methadone (Count 3); and Oxycodone (Count 4) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).[1] She was sentenced to 30 months' imprisonment on each count, to run concurrently. She now appeals.

## I. Facts

Johnston was an osteopathic physician, specializing in neurology, working in Naples, Florida. In 2007, a medical malpractice investigator with the State of Florida Department of Health received information that Johnston may have been unlawfully proscribing narcotics. She transmitted this information to Amber Baginski, a detective with the Naples Police Department that was assigned to the Drug Enforcement Administration ("DEA") as a task force officer. The DEA instituted an investigation and sent three undercover detectives into Johnston's office posing as patients. They were all instructed not to bring any medical files, prescription bottles, or "show proof that they had had any kind of medical exam or

---

[1] Roxicodone and Methadone are Schedule II narcotics and Xanax is a schedule IV narcotic.

had been given any prescriptions." On the basis of the evidence gained from these visits, Johnston was indicted and tried.

The three undercover detectives testified at trial. The substance of their testimony was as follows: Mark Schaible, posing as Marcus Damm, visited Johnston's office on June 11, 2007.[2] Schaible complained of back pain, told Johnston that he was injured while exercising at the gym, and that he had pain radiating down his leg. Schaible told Johnston that he worked in Daytona, but when Johnston commented on the long distance her traveled to see her, Schaible stated that he was staying with his mother in nearby Fort Myers. Johnston told Schaible that he had a "herniated disk back there that's causing all the pain" and that "[s]ooner or later" he would need an MRI, but she did not immediately recommend that he get one done. Schaible testified that certain statements that he made to Johnston were intended to act as "red flags," including: (1) he was previously a patient of Dr. Pizarro, who was under indictment for soliciting sex in exchange for narcotics; and (2) he had been "bumming" medications from his friends. Johnston tested Schaible's reflexes, had him extend his arms and touch his fingertips, and checked his blood pressure. Johnston only looked at Schaible's back when discussing his tattoos. She did not otherwise touch his back, perform

---

[2] Schaible recorded his conversation with Johnston and the tape was played at trial.

any other tests, or recommend an x-ray.

Schaible informed Johnston he was taking four to five Roxicodone tablets per day. Johnston replied, "I don't know how much you're getting, or where you're getting it from. Which is fine." Schaible also told Johnston that he was taking two to three 1-milligram tablets of Xanax per day, which Johnston noted was a lot. Johnston commented that Schaible's blood pressure was low, attributing this to the fact that he was probably "nice and mellow" from the Roxicodone and Xanax. Schaible also commented, "I always kind of wondered why you can go into a store and buy a gallon of vodka and a carton of cigarettes, you can have a good time, but you can't take a pain pill." Schaible paid cash for the cost of his visit and left Johnston's office with prescriptions for 150 15-milligram tablets of Roxicodone and 90 1-milligram tablets of Xanax.

Schaible had a follow-up appointment scheduled for July 9, but "to throw up another red flag" he called three weeks after his first appointment, claiming that he ran out of his medication, even though the prescription should have lasted longer. The appointment was moved to July 5. At this visit, Schaible complained that his pain was too high, that the Roxicodone was not working, and that he had been receiving 40-milligram Methadone wafers from his friend. Johnston acknowledged that Methadone is "pretty powerful stuff" and "real hard core," and

4

that moving from 15 to 40-milligrams is "quite a jump." Schaible explained that he took Methadone as often as six times per day, but that he only bought twenty pills off of his friend because "he needs to make some money too." Johnston did not examine Schaible at all during the visit and wrote him a prescription for 150 40-milligram Methadone wafers and refilled his Xanax prescription.

Amber Baginski, who posed as Amber Needles, was the second patient in the investigation. She testified that on June 27, 2007, she arrived at Johnston's office and noticed that several patients in the waiting room appeared to be high. Baginski was taken to an examination room, where she met Johnston.[3] She told Johnston that she had been a patient of Dr. Pizarro and that, due to general back pain, she had been taking 15-milligram Roxicodone tablets.[4] Johnston asked whether Baginski had fallen or been in an accident, and when Baginski said no, Johnston responded that most patients tell her the pain resulted from one of these incidents. Johnston checked Baginski's reflexes, blood pressure, and had her touch her fingertips, but did not examine Baginski's back or perform any other tests. As Baginski held out her hands, Johnston asked, "Doesn't the pain radiate down your

---

[3] Baginski carried a recorder, but the device malfunctioned and therefore no tapes were presented at trial.

[4] Johnston did not request any of medical records, but did recommend that she get an MRI. Even though Baginski had insurance, she declined, stating that it was too expensive. Johnston did not inquire further.

legs?" Baginski believed Johnston was "telling me what I needed to say in order to obtain the pain medication." When Baginski confirmed that the pain radiated, Johnston gave her a prescription for 90 15-milligram tablets of Roxicodone. According to Baginski, the entire examination lasted less than five minutes.

Donald McDougall, who posed as Donald Nieczticz, was the final patient in the investigation. On July 10, 2007, he visited Johnston's office, where he explained to Johnston that he had experienced pain in the past, but was not currently suffering any pain.[5] Johnston asked if McDougall had an MRI and he told her that although he had, it did not reveal anything. McDougall told Johnston that he had a doctor near his home in the Florida Keys and that he was currently taking 20-milligram Oxycontin tablets, to which Johnston replied, "you can't take that. You're overmedicated." Nonetheless, Johnston did not follow-up about the distance McDougall traveled to see her, the name of his regular physician, or when he last had his prescription filled. As with the other patients, Johnston tested McDougall's reflexes, checked his blood pressure, and had him hold out his arms and touch his fingertips, but did no further examinations. McDougall testified that most of the fifteen-minute examination was spent discussing fishing and real estate. At the close of the visit, Johnston prescribed 90 30-milligram tablets of

---

[5] As with Baginski, the recording device malfunctioned and therefore no tapes were presented at trial.

6

Roxicodone, 90 100-milligram Neurontin, and 60 pills of Flexeril.[6]

Johnston's office manager testified that Johnston used pre-printed examination forms to save time; Johnston would then cross out whatever information was incorrect after she examined the patient. About 99 percent of Johnston's pain management patients received controlled substance prescriptions.

The government called two expert witnesses: Dr. Richard Hood and Dr. Sherri Pinsley. Hood testified as to the high strength of the drugs prescribed by Johnston and their many potentially dangerous and deadly side effects, especially when taken together or with alcohol. He testified that a doctor should not increase from a low dose of Roxicodone to a high dose of Methadone based solely on a patients' claims that Methadone is more effective for him than Roxicodone. Instead, a doctor could confirm what drugs a patient was using by urinalysis, obtaining medical records, or obtaining past prescription bottles. Hood also explained that a patient illegally buying prescription drugs is a "red flag . . . [for] diversion and addiction." Finally, Hood testified that normally if a patient complains of back pain, a doctor should palpate the back to see if it elicits muscle spasms or tenderness.

Pinsley testified that in her pain management practice, an initial patient visit

_____

[6] Neurontin and Flexeril are prescription pain killers and muscle relaxers, but are not covered by the CSA.

would include a head-to-toe examination, including range of motion exercises and palpating the vertebras of the spine. Pinsley testified that she would only treat a patient after obtaining the patient's medical records and, if the patient had not undergone any tests, she would require an MRI or x-ray be conducted.[7] Pinsley said that controlled substances are always her last resort and, before prescribing controlled substances, she requires patients to take a toxicology test so that she can confirm whether they are taking any medication. She testified that Johnston's patient files were sparse, that her exams were limited, and that she was concerned that Johnston prompted patients to give certain answers about pain. She noted that she was troubled by the red flags raised by the undercover agents, including traveling a long distance to see Johnston, lack of previous medical records or tests, buying medications illegally, and requesting more medications too quickly. In her opinion, Johnston prescribed stronger medications than appropriate and acted outside the scope of professional practice.

Johnston's case included testimony by her own expert, Dr. Thomas Romano. Romano was of the opinion that Johnston's conduct was professional and consistent with standards of professional care in the United States. Romano explained that there is no objective test for pain and that a doctor has to listen to a

---

[7] Pinsley testified that she would sometimes give prescriptions that were of limited quantity and dosage until she could obtain the records or get tests done.

patient's report of pain and rely on her own judgment in determining whether the patient is reliable. Romano acknowledged that some of the statements made by the detectives could be red flags, but noted that there could be legitimate explanations for each that would not have prevented a doctor from treating a patient. Romano opined that Johnston acted in good faith in prescribing the medications to the three patients.

The jury ultimately convicted Johnston of all charges. Johnston appeals to this court, arguing that the district court erred by: (1) applying a national, rather than state-specific, standard of care; (2) admitting prejudicial "red flags" evidence and permitting the government's experts to testify to legal conclusions based on the red flags; and (3) denying Johnston's motion for acquittal on the ground that the government did not prove that Johnston acted with the requisite mens rea.

## II. Discussion

A. National standard of care

A doctor may not be convicted under the CSA for issuing prescriptions to patients unless the doctor failed to act in good faith and for a legitimate medical purpose. United States v. Merrill, 513 F.3d 1293, 1301-02 (11th Cir. 2008). Johnston acknowledges this standard, but argues that the district court erred by instructing the jury that it should apply a national standard of care in determining

9

whether Johnston failed to act in furtherance of a legitimate medical purpose. Specifically, Johnston takes issue with the district court's instruction that, "a physician's mere subjective personal belief that she is meeting a person's medical needs by prescribing a controlled substance is not sufficient to show good faith if the physician acts outside the accepted standard of medical practice in the United States" (emphasis added). Johnston argues that under Gonzales v. Oregon, 546 U.S. 243 (2006), state medical standards should be used to determine whether a doctor acted in conformance with accepted medical standards for the purposes of the CSA. Johnston argues that by failing to instruct the jury that Florida's standard of care governs, the district court committed reversible error. Moreover, Johnston argues that this error is jurisdictional and therefore should be review de novo.

Where a party properly objects to the jury instructions, we review the legal correctness of a district court's jury instruction de novo and issues of phrasing for abuse of discretion. United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000). Ordinarily, if the complaining party fails to object, we review for plain error. United States v. Schlei, 122 F.3d 944, 973 (11th Cir. 1997). A party waives the ability to contest the propriety of the instructions, however, if the party invites the error by requesting the substance of the instructions that she later seeks to challenge on appeal. United States v. Stone, 139 F.3d 822, 838 (11th Cir. 1998).

10

"Where invited error exists, it precludes a court from invoking the plain error rule and reversing." United States v. Silvestri, 309 F.3d 1311, 1327 (11th Cir. 2005) (citation omitted).

In this case, not only did Johnston fail to object to the district court's imposition of a national standard of care, but she invited the alleged error by requesting that the court charge the jury that in order to convict they must find that she "acted outside the course/scope of professional practice, not in accordance with a standard of medical practice generally recognized and acted in the United States" (emphasis added). Furthermore, Johnston's proposed jury instructions included charging the jury on the section of the Florida Administrative Code that addresses the state's standards for the use of controlled substances for the treatment of pain, but Johnston affirmatively withdrew this instruction at the charge conference.[8]

We are also unpersuaded by Johnston's argument that the alleged error in the jury instructions is jurisdictional. "A jurisdictional defect is one that 'strip[s] the court of its power to act and ma[kes] its judgment void.'" McCoy v. United States, 266 F.3d 1245, 1249 (11th Cir. 2001) (citation omitted). An indictment suffers from a jurisdictional defect when it charges no crime at all, i.e. a non-

---

[8] At trial, Johnston's attorney also questioned Romano about his opinion as to whether Johnston's treatment "was consistent with accepted professional standards of care in the United States."

11

offense.  United States v. Peter, 310 F.3d 709, 714-15 (11th Cir. 2002)  No such situation exists here because the district court had jurisdiction pursuant to a valid indictment charging Johnston with crimes under the CSA.  Because the alleged error is not jurisdictional, we conclude that invited error doctrine precludes review of the jury instruction that applied a national standard of care.

## B.  Red flags evidence

Johnston argues that the district court erred by permitting the witnesses to testify about "red flag" profiling evidence and that admitting such evidence prejudiced the jury.  Johnston alleges that "red flags" is a government-created standard for identifying drug abuse that has not been accepted by the medical community, and therefore is not relevant to the medical standard of care.[9] Additionally, Johnston contends that the testimony about red flags was inadmissible under Daubert[10]  and the Federal Rules of Evidence because the government failed to establish that the testimony was reliable or relevant.  Finally, Johnston argues that the district court improperly permitted experts to use the red flag testimony to reach legal, rather than medical, conclusions.

---

[9] Johnston did not raise this argument before the district court and submits it for the first time in her brief.  She argues that the term "red flags" originated from a 1999 U.S. Drug Enforcement Administration publication entitled "Don't be Scammed by a Drug Abuser."

[10] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (discussing use of expert testimony that has been determined to be reliable and relevant).

Johnston did not object to the admissibility of red flag testimony or the experts' conclusions that they reached based on the red flags. Where a party fails to raise an evidentiary objection, we review only for plain error. United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007). To demonstrate plain error, Johnston "must show that: (1) an error occurred; (2) the error was plain; (3) it affected [her] substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." United States v. Gresham, 325 F.3d 1262, 1265 (11th Cir. 2003). An error is not plain unless it is contrary to precedent directly resolving a legal issue. United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).

We conclude that Johnston has failed to show that the district court committed plain error by admitting the testimony. The Supreme Court has held that an officer does not have reasonable suspicion that someone is engaged in criminal conduct solely on the basis that he fits a profile. Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam) (discussing "the so-called 'drug courier profile'"). This court does not permit the admission of evidence indicating that a defendant fit a particular criminal profile because such evidence is "inherently prejudicial because of the potential [it has] for including innocent citizens." United States v. Hernandez-Cuartas, 717 F.2d 552, 555 (11th Cir. 1983). The instant case, however, is distinguishable. First, the red flag statements were used to create a

13

profile about the <u>patient</u>, not Johnston. These statements were intended to give Johnston reason to believe that Schaible was an addict or was selling his medications. The red flags were introduced to show that Johnston failed to meet the required standard of care in dealing with her patients; not to show that Johnston somehow fit a specific criminal profile. Second, unlike in <u>Reid</u>, Johnston was not identified as a suspect because she fit a certain criminal profile. Instead, she was already a suspect prior to Schaible's red flag statements. There was therefore no danger that an innocent person would be swept up in the investigation simply because she fit a certain profile.

We further conclude that the experts' testimony about the red flags was properly admitted pursuant to Fed. R. Evid. ("Rule") 702. Under Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. In <u>Daubert</u>, the Supreme Court established a two-part test under Rule 702 for the admissibility of expert testimony: a trial judge must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. Some factors that should be considered in exercising this gate-keeping function

14

include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." United States v. Douglas, 489 F.3d 1117, 1124-25 (11th Cir. 2007). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (en banc) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

Johnston does not challenge the qualifications of the experts, but rather argues that "red flags" are not generally accepted scientific evidence of drug-dealing and addiction. We note, however, that neither the government nor witnesses treated "red flags" as a term of art. The witnesses' testimony treated "red flags" as synonymous with "warning signs." The doctors testified that in light of the strange statements made by Johnston's patients, had they confronted similar statements in their own practices, they would have sought further information from the patients before prescribing narcotics. They did not treat "red flags" as a medical standard and therefore Johnston's argument that this evidence is inadmissible under Daubert fails.

We also reject Johnston's argument that the experts improperly testified to legal conclusions. Although experts may not testify to legal conclusions, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). Pinsley testified as to the appropriate standard of care in the medical field and gave her opinion that the prescriptions "were written without any legitimate medical purpose." Criminal knowledge and intent are issues of fact, not law. See United States v. Greenfield, 554 F.2d 179, 183 (5th Cir. 1977)[11] ("[D]efendant strenuously asserted that the prescriptions . . . were for a legitimate medical purpose and within the course of his professional practice. Necessarily, the issue of criminal intent or guilty knowledge was a factual issue for the jury to resolve."). Pinsley's testimony was therefore appropriate. In fact, Johnston questioned her own expert about whether he believed Johnston "acted in good faith in prescribing the substances" and "entered into . . . a legitimate therapeutic physician/patient relationship" with each undercover officer.

We therefore conclude that the district court did not plainly err by admitting the red flag evidence and permitting the experts to give opinions based in part on

---

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this court held that all decisions handed down by the former Fifth Circuit before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit.

16

such evidence.

C.  Mens rea

Johnston finally argues that the government did not establish that she acted with bad intent.  She contends that the government's only evidence of mens rea came from her failure to react to the detectives' red flags.

We review the denial of a motion for judgment of acquittal based on sufficiency of the evidence de novo, drawing all inferences in the government's favor.  United States v. Bowman, 302 F.3d 1228, 1237 (11th Cir. 2002).[12]  To convict under 21 U.S.C. § 841, the government must prove that the physician knowingly or intentionally dispensed controlled substances and that she did so other than for a legitimate medical purpose and in the usual course of her professional practice.  United States v. Rosen, 582 F.2d 1032, 1033 (5th Cir. 1978).  Knowledge can be proven through "inferences based upon surrounding circumstances."  United States v. Vera, 701 F.2d 1349, 1358 (11th Cir. 1983); see also United States v. Woodard, 531 F.3d 1352, 1360 (2008) (explaining that the elements can be shown by direct or circumstantial evidence).  The credibility of a

---

[12] The government argues that Johnston did not preserve this issue for appeal.  We disagree.  Johnston moved for a judgment of acquittal at the close of the government's case and at the close of the evidence, arguing that "the evidence is insufficient as a matter of law."  Although general motions such as this are typically disfavored, we nonetheless conclude that because intent is an essential element of the crime, the issue of mens rea was adequately preserved for appeal.

witness is for the jury to determine. United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir. 1990).

We conclude that there was sufficient evidence from which the jury could adduce that Johnston dispensed the medication for reasons other than legitimate medical purposes. The jury heard several suspicious statements that Schaible made to Johnston, including that he was illegally purchasing medication off of friends, that he ran out of medication earlier than he should have, and insinuations that he might also be selling his medication. The jury also heard Baginski's testimony that she believed that Johnston was prompting her with what to say in order to obtain pain medication. The government's experts testified that Johnston's notes were very sparse, that her examinations were unreasonably brief, that she should have physically examined patients, conducted medical tests, and obtained medical records, and that she gave unreasonably strong prescriptions to the patients. Pinsley expressed her opinion that the prescriptions were written outside the scope of medical practice and for no legitimate medical purpose. The jury also heard Johnston's expert's contrary opinion, but was free to choose among reasonable constructions of the evidence. See United States v. Alvarez-Sanchez, 774 F.2d 1036, 1039 (11th Cir. 1985). The district court therefore did not err in denying the motion for a judgment of acquittal.

18

### III. Conclusion

For the reasons stated, the convictions are hereby affirmed.

**AFFIRMED.**