Harold Lloyd Murphy, SENIOR UNITED STATES DISTRICT JUDGE
This case is before the Court on the Motion to Strike Supplemental Expert Report of Brian I. Wellington ("Motion to Strike") filed by Defendants Forestar Realty, Inc. and Temco Associates, LLC (collectively, the "Forestar Defendants") [81].
I. Procedural Background
On December 18, 2015, Plaintiffs filed this lawsuit. (Compl. (Docket Entry No. 1).) On February 16, 2016, the Forestar Defendants filed a Motion to Dismiss. (Mot. Dismiss (Docket Entry No. 16).) Plaintiffs responded to the Motion to Dismiss, attaching the Affidavit of Dr. Brian Wellington, P.E. (Aff. of Brian Wellington, P.E. (Docket Entry No. 17-2).) On April 7, 2016, the Court granted in part and denied in part the Motion to Dismiss, and dismissed Count II of Plaintiffs' Complaint. (Order of Apr. 7, 2016 (Docket Entry No. 25).)
On June 8, 2016, the Parties filed their Joint Preliminary Report and Discovery Plan, which the Court approved on June 9, 2016. (Jt. Prelim. Report & Discovery Plan (Docket Entry No. 35); Scheduling Order (Docket Entry No. 36).) On July 11, 2016, the Court, at the Parties' request, extended discovery through and including September 3, 2016. (Order of July 11, 2016 (Docket Entry No. 42).) On August 30, 2016, the Court extended discovery through November 11, 2016. (Order of Aug. 30, 2016 (Docket Entry No. 48).)
On October 26, 2016, Plaintiffs filed their Second Amended Initial Disclosures, attaching an Expert Report from Dr. Wellington. (Rule 26 Report of Brian I. Wellington (Docket Entry No. 50-2).) On November 15, 2016, the Court extended discovery through March 1, 2017. (Order of Nov. 15, 2016 (Docket Entry No. 53).)
On January 20, 2017, the Court granted Defendant New Towne Properties, LLC's ("Defendant New Towne") Consent Motion to Stay and Extend Discovery Deadlines. (Order of Jan. 20, 2017 (Docket Entry No. 60).) The Court stayed discovery until March 1, 2017. (Id. )
On May 2, 2017, the Court granted a Motion to Amend Scheduling Order, and extended discovery through July 31, 2017. (Order of May 2, 2017 (Docket Entry No. 71) at 2.) The May 2, 2017, Order stated, in relevant part:
2. Defendant New Towne may file Rule 26 Expert Report(s) not later than May 19, 2017.
3. [Plaintiffs] and the Forestar Defendants may file supplements to existing Rule 26 Expert Reports ... not *1320 later than May 19, 2017. As noted in the Motion, the parties dispute the extent to which existing Rule 26 Expert Reports may be supplemented. In this regard, the parties may file motions to exclude or strike expert reports or testimony, with such motions due not later than August 31, 2017.
(Id. at 1-2.)
On May 19, 2017, the Court granted the Parties' Motion to Amend Scheduling Order, and extended discovery through September 29, 2017. (Order of May 19, 2017 (Docket Entry No. 74) at 2.) The May 19, 2017, Order stated, in relevant part:
1. Defendant New Towne may file Rule 26 Expert Report(s) not later than July 18, 2017.
2. [Plaintiffs] and the Forestar Defendants may file supplements to existing Rule 26 Expert Reports ... not later than August 17, 2017. As noted in the Motion, the parties dispute the extent to which existing Rule 26 Expert Reports may be supplemented. In this regard, the parties may file motions to exclude or strike expert reports or testimony, with such motions due not later than October 30, 2017.
(Id. at 1.)
On August 17, 2017, the Court granted the Parties' Motion to Amend Scheduling Order, and extended discovery through October 13, 2017. (Order of Aug. 17, 2017 (Docket Entry No. 76) at 1.) The August 17, 2017, Order also stated, in relevant part:
1. [Plaintiffs] and the Forestar Defendants may file supplements to existing Rule 26 Expert Reports ... not later than August 31, 2017. As noted in the Motion, the parties dispute the extent to which existing Rule 26 Expert Reports may be supplemented. In this regard, the parties may file motions to exclude or strike expert reports or testimony, with such motions due not later than November 13, 2017.
(Id. )
On August 31, 2017, Plaintiffs filed their Fourth Initial Disclosures, attaching a Supplemental Expert Report from Dr. Wellington. (Supp. Expert Report of Brian I. Wellington (Docket Entry No. 78-1).)
On September 11, 2017, the Forestar Defendants filed their Motion to Strike Dr. Wellington's supplemental expert report. (Mot. Strike (Docket Entry No. 81).) The briefing process for the Motion to Strike is complete, and the Court finds that the matter is ripe for resolution.
II. Dr. Wellington's Reports
A. Expert Report of Brian I. Wellington, Ph.D., P.E.
In his Expert Report, Dr. Wellington notes that he "reviewed the Complaint ..., analyzed the hydrology report and development plans, and considered the State of Georgia's [General Permit], Georgia water quality standards set forth in Ga. R. & Reg. § 391-3-6-.03 et seq. , and the [CWA], 33 U.S.C. §§ 1311, 1317, 1321, 1342, 1344, and 1362." (Wellington Expert Report at 2.) Dr. Wellington notes that he attempted to determine: (1) the extent of storm water impacts to the Property from storm water discharge from the Subdivision; (2) what portion of the Subdivision was discharging storm water to the Property; (3) the extent of sediment impacts to the Property; and (4) the extent of sediment[ ] impacts to Little Pumpkinvine Creek. (Id. ) Dr. Wellington noted that he visited the Property and Subdivision on February 24, 2016, and on August 24, 2016, and that he *1321 "reviewed dozens of photographs and video provided to [him] by [Plaintiffs]." (Id. )
In Opinion 1 of his Report, Dr. Wellington opined that the Property received a significant volume of storm water from upgradient lots in the Subdivision. (Wellington Expert Report at 2.) According to Dr. Wellington:
The [Property] is located at the low point in the cul de sac of Lullwater Lane, a street that has slope of as much as 11%. Storm water generated on lots 7, 8[,] 9, 10, 11, 14, 15, 16, 17, and 18 drains towards [the Property] via Lullwater Lane. These lots also receive significant storm water generated from upgradient offsite areas, located in Seven Hills Unit C. On the section of Lullwater Lane that drains towards [the Property] are located two curb inlets that were installed to capture storm water. However, due to the steep slopes of this road section, these drop inlets have proven ineffective for capturing storm water from the identified upgradient lots. This has resulted in significant quantities of storm water being discharged down the road towards [the Property]. Located adjacent to [the Property] is a third curb inlet that was installed to capture any storm water bypassing the initial 2 catch basins. However, the driveway of [the Property] is located at approximately the same elevation as the road side drains that transport storm water to this inlet. Therefore instead of flowing into this curb inlet, a significant volume of storm water is discharged onto [Plaintiffs'] driveway and directed to their home causing flooding. In order to alleviate this flooding two grate inlets were installed, one at the top of the driveway and the other at the bottom of the driveway and immediately in front of the garage of [Plaintiffs'] home. However, due to the volume and velocity of storm water being discharged down Lullwater Lane, this solution has proven to be ineffective in capturing and prevent[ing] storm water from flowing towards and flooding [the Property].
In an attempt to prevent sediments from entering the catch basins on the site, erosion control devices referred to as "pigs in a blanket" were installed at the entrance of the catch basin. These "pigs in the blanket" resulted in restricting flows into the catch basin and directing more storm water to [the Property], further exacerbating the flooding of [the Property].
(Id. at 2-3.)
Dr. Wellington also opined that the Property receives significant sediment during the construction of homes on upgradient lots. (Wellington Expert Report at 3.) Dr. Wellington noted that Plaintiffs' home was one of the first constructed in the cul de sac, and during construction on Lots 9, 10, 11, and 12, sediments escaped the construction sites and were directed to, and deposited on, the Property, aided by the volume of stormwater discharged from upgraded lots onto the Property. (Id. ) Dr. Wellington stated that "[s]ediment laden water that does not enter [Plaintiffs'] home and garage[ ] crosses the western portion of [the Property] and is ultimately discharged into Little Pumpkinvine Creek in violation of the Seven Hills Erosion Control Permit and the CWA. (Id. at 5.) Dr. Wellington noted:
During my site visit on February 24, 2016, Lots 7 and 8 had been cleared with Lot 8 appearing to be the most active. I observed evidence of sediment-stained grass in areas receiving storm water drained from Lot 8, ... and also stained water flowing in the side drain along Lullwater Lane.... These flows suggest that the erosion control measures installed on Lot 8 are allowing sediments *1322 to escape the site. In fact, Lot 8 contained a large pool of standing water which will ultimately flow from the lot and to the road during significant storm events.... During my visit I also observed a significant build up of sediments behind the silt fences on Lot 8, ... and a partially collapsed silt fence on Lot 7, ... indicating poor maintenance of erosion and sediment controls. In my opinion, the failure to properly maintain erosion and settlement controls is a violation of the Seven Hills Erosion Control Permit.
(Id. )
Dr. Wellington further observed that, during his August 24, 2016, visit, Lot 7 was under construction, and large portions of the lot consisted of bare soil. (Wellington Expert Report at 10.) Dr. Wellington noted that "[s]torm water generated from these bare soils is directed to the entrance of the lot which is unprotected by silt fences or other sediment control BMPs," and opined that "[t]he failure to properly design, install and maintain BMPs is a violation of the Seven Hills Erosion Control Permit." (Id. )
Dr. Wellington also stated:
The main erosion control measures or [BMPs] designed and installed on Seven Hills Subdivision Unit D included silt fences and three (3) temporary settlement detention ponds. The design of these ponds requires that the volume of the ponds be determined by the total area draining into the ponds and not by the disturbed area. If the disturbed area is used to size the ponds, then ponds are ineffective in trapping sediments resulting in discharge of sediments to streams, wetlands, and other water bodies in the vicinity of the property being developed.
In designing the temporary sediment ponds for the Subdivision, the design engineer failed to adhere to design according to the required design standards. All the temporary sediment basins were designed using the disturbed area and not the total drainage area. This resulted in under sizing of pond A by 7% and pond B by 441%. This resulted in significant sediments escaping the site and being deposited in Little Pumpkinvine creek in violation of the CWA.
During the construction of the Subdivision, various BMP violations have been documented starting in 2013 and have continued in 2016, in weekly inspections report[s] provided by Gaia Environmental Consulting. These violations include but are not limited to the following:
a) Formation of rills and gullies
b) Lack of installation of silt fences per approved plans
c) Lack of maintenance of silt fences
d) Sediments on road surfaces
e) Lack of final stabilization on completed lots
Due to these violations the development received various citations, including a notice of violation and stop work orders issued by Paulding County Erosion and Sediment Control on January 6, 2014, [and] May 29, 2015.
(Wellington Expert Report at 12 (footnotes omitted).)
In his fourth opinion, Dr. Wellington opined that sediments originating on the Subdivision have been, and were continuing to be, discharged into Little Pumpkinvine Creek. (Wellington Expert Report at 12.) Dr. Wellington explained:
The catch basins on the Subdivision discharge through a culvert outlet pipe located on the western boundary of [the Property].... A small sediment trap built with riprap is located at the exit of the culvert outlet. Storm water discharged *1323 from the culvert flows over the northwest portion of [the Property] and into Little Pumpkinvine Creek. During my site visit of February 24, 2016, I observed a buildup of sediment within the sediment trap at the culvert outlet. Since no detention or other storm water controls exist on the Site, the uncontrolled peak rate of storm water discharge more likely than not will re-suspend the sediments and discharge them into Little Pumpkinvine Creek.
(Id. at 12-13.) Dr. Wellington also noted that Plaintiffs previously "observed sediment laden storm water originating from upgradient lots and flowing through the culvert pipe being discharged into Little Pumpkinvine Creek." (Id. at 13.) Dr. Wellington stated: "The discharge of sediment laden storm water is obvious in the photographs ... and constitutes a clear violation[ ] of the Seven Hills Erosion and Sediment Control Permit and the [CWA], the Georgia Erosion and Sedimentation Act, and the Georgia Water Quality Control Act." (Id. ) Dr. Wellington also noted that he viewed a video that Plaintiff Wendy Coward took on December 15, 2015, in which "the catch basin inlet protection (i.e. pig in blanket) had been removed allowing sediment laden storm water to enter directly into the catch basin and discharges through the drainage pipe then over the northwest portion of [the Property] and into Little Pumpkinvine Creek in violation of the CWA." (Id. )
Dr. Wellington concluded:
Based on inspections of [the Property] and the Subdivision; review and analysis of the construction drawings and hydrology report; and review of historic erosion and sedimentation control violations, it can be concluded that [the Property] is being negatively impacted by storm water and sediments discharged from the Subdivision. Specifically[, the Property] has been and continues to be impacted by excessive, sediment laden storm water flows resulting in flooding of the garage and basement of [Plaintiffs'] home and property. It can also be concluded that sediments generated during construction in Unit D of the Subdivision have been discharged and more likely than not continue to be discharged into Little Pumpkinvine Creek in violation of the CWA.
(Wellington Expert Report at 15.)
B. Amended Wellington Expert Report
Plaintiffs filed another version of Dr. Wellington's expert report, which appeared simply to add his CV, a statement of compensation, a list of publications, and a list of previous testimony. (Am. Wellington Expert Report (Docket Entry No. 54-2).)
C. Supplemental Expert Report of Brian I. Wellington, Ph.D., P.E.
In his Supplemental Expert Report, Dr. Wellington noted that, "[s]ince my initial report I have been provided with additional documents related to the design, installation and maintenance of [BMPs] of [Defendants] and I have reviewed the depositions of various individuals involved in this litigation," and offered "Supplemental Expert Opinions." (Wellington Suppl. Expert Report at 2.) Dr. Wellington stated that he reviewed Plaintiffs' Complaint and their allegations. (Id. ) Dr. Wellington further observed:
The CWA requires a permit under the NPDES for storm water discharges associated with construction and industrial activities including clearing, grading and excavation of at least one acre. Point source discharges of pollutants to waters of the United States are prohibited unless they are in compliance with certain *1324 provisions of the CWA. Based upon my investigation, Little Pumpkinvine Creek is considered both Waters of the United States and State Waters of Georgia and is identified as the receiving waters on [Defendants'] Notice of Intent (NOI).
(Id. ) Dr. Wellington stated:
The issuance of [t]he General Permit for development of a property in Georgia is based on, among other things, the designed and approved construction drawings that include BMPs in both (1) erosion and sedimentation control plans and (2) the storm water management plans. Once the permit has been issued the developer (i.e. [the Forestar Defendants] ) is obligated to develop the property in accordance with approved plans incorporating all designed BMPs. Any deviation[,] modification or omission of BMPs from the plans requires approval of the local issuing authority (i.e. Paulding Co.). The General Permit is violated when no approval is sought and/or given and modification or omissions in erosion and sediment control and/or storm water management BMPs are undertaken during development.
(Id. at 2-3.)
Dr. Wellington also noted:
The Seven Hills subdivision was built in different phases or units. [The Property] is located in Unit D, which was designed and developed after Unit C. Unit C discharges storm water into and onto Unit D. A review of the approved construction plans for Unit C shows that a ditch (i.e. a storm water BMP and sometimes referred to as a drainage swale) was designed to transport storm water from unit C to Pumpkinvine Creek. The ditch was designed to be located in a 20 feet drainage easement atop the ridge on the western boundary of Unit D. The location of this ditch and drainage easement [is] shown in the approved development drawing for Unit D.
The approved construction plans for Unit C and Unit D are dated April 21, 2004 and April 21, 2005. However, based on the evidence and testimony of the developer's representative, Joshua Baxter ..., the approved ditch (i.e. a storm water BMP) was not installed until June or July 2015 and August of 2016, and only after [Plaintiffs] complained about the storm water and erosion and sediments problems that were occurring on [the Property] due to land disturbance activities, and being discharged into Little Pumpkinvine Creek. The General Permit requires BMPs to be properly designed, installed and maintained to prevent or reduce pollution for all construction activities. Where BMPs are not properly designed, installed and maintained, it is a violation of the General Permit for each day those BMPs are not properly designed, installed and maintained. Thus, [t]he General Permit for development of [the Subdivision] was being consistently and continuously violated for a period of approximately 10 years. No reasons were provided by Mr. Baxter as to why the ditch that was designed and required to be installed around 2005 was only installed more than 10 years later. Mr. Baxter stated that "... but the plans don't call specifically, the date that it needs to be installed." Mr. Baxter is wrong. Construction plans are very specific as to when BMPs are to be installed. The ditch was included as part of the Phase 1 Erosion and Sedimentation control plan sheet for Unit C. The Phase 1 Plan included the installation of a check dam within the ditch. In the Phase 3 Erosion and Sedimentation control plan for Unit C the upper portion of the ditch was to be graded. Thus, based on the 2005 plans for Unit C, the ditch was an approved *1325 and necessary BMP that should have been installed when other erosion and sedimentation BMPs were being installed during the defined phases and not more than 10 years later. The failure to install the ditch in the designed phase sequence as dictated by the construction drawings is a significant violation of the Seven Hill subdivision [l]and disturbance permit. The design intent of the ditch was to provide a conveyance system to discharge storm water from Unit C in a controlled manner into Pumpkinvine Creek via Unit D. However, the failure to install the ditch resulted in 10 years of uncontrolled storm water discharge from Unit C into Unit D creating both storm water and erosion problems as experience[d] on [the Property] and as evidenced by repeated sediment discharges in excess of permit limits into Little Pumpkinvine Creek. The erosion problems experienced by [Plaintiffs] were significantly exacerbated when individual lots proximate to [the Property] underwent vertical construction.
I have reviewed numerous photographs and videos provided to me by [Plaintiffs] taken during rain events. These photographs and videos show excessive amount[s] of sediment-laden storm water being discharged from [Defendants'] property onto [the Property] and into Little Pumpkinvine [C]reek resulting in substantial visual contrast by these discharges into the receiving waters. In my opinion, it is more likely than not that these discharges constitute violations of the CWA, the Georgia Erosion and Sedimentation Act and the Georgia Water Quality Control Act. These discharges are a direct result of [Defendants'] failure to install approved BMPs at both Seven Hills Unit C and Seven Hills Unit D.
The erosion control plans for Unit D include[ ] BMPs designed for each individual lot. These individual lot BMP design[s] are based on the assumption that the BMPs will only provide erosion and sedimentation control for storm water generated within a given lot. The failure to install the ditch to transport storm water from Unit C resulted in substantial additional and uncontrolled storm water from Unit C impacting the lots in United D. Since the individual lot BMPs in Unit D only account for flows generated in the lots, the BMPs as installed were ineffective in providing erosion and sedimentation control. This more likely than not exacerbated erosion control problems on these lots resulting in sediments being transported and deposited on [the Property]. My opinions in this regard are further supported by Jon Vansant of [Defendant New Towne], who reportedly followed the approved BMPs plan when constructing homes [on] these lots. In his affidavit dated August 30, 2017, section 15, Mr. Vansant stated that "[Defendant] New Towne followed the erosion control plan developed by Gaskins Engineering for the [Subdivision]. However, it is my belief that the plans were not designed to handle the excess water that came from Unit C because of the failure to construct the drainage swale below Unit C."
The failure to install the ditch to convey storm water generated in Unit C in a controlled manner across Unit D and into Little Pumpkinvine Creek for more than 10 years is a violation of the [l]and disturbance permit for [the Subdivision]. This violation directly contributed to the storm water and sedimentation problems on [the Property] and discharges of excessive levels of sediment to Little Pumpkinvine Creek.
The failure to install the ditch for 10 years and its effects on erosion and sediment control BMPs more likely than not *1326 also impacted Little Pumpkinvine Creek to which storm water from Unit D ultimately discharges. By rendering some lot BMPs ineffective within Unit D, the storm water generated in Unit C resulted in the escape of sediments in excess of permitted levels from these lots and their discharge into Pumpkinvine Creek resulting in a substantial visual contrast therein.
In his report, [the Forestar Defendants'] expert, Dr. Nutter, claims that the BMPs were adequately installed and maintained in Unit D. He based his opinion on an analysis of rainfall event. Dr. Nutter concluded from his analysis that some of the rainfall events "were intense enough to overwhelm the BMPs" and that "(a) BMP overwhelmed is not necessarily a violation of the General Permit". Dr. Nutter provides examples of these "extreme" rain events as follows: June 24, 2016 with a total rainfall of 2.14 inches, a 7-day event occurring in August 2015 with a total of 2.44 inches, and a rainfall event that occurred between December 24 to 25 2015 with a total rainfall 2.74 inches. It is unclear what rainfall criteria or official/approved BMP design manual Dr. Nutter used to define rainfall events as extreme enough to overwhelm BMPs installed in Unit D. In the State of Georgia, the General Permit requires that BMPs must be designed in accordance with the design specifications contained in the Manual for Erosion and Sediment Control in Georgia. This Manual was developed in accordance with provisions of the Georgia Erosion and Sedimentation Act. The Act requires that erosion and sediment control protection for land disturbance activities must provide protection for up to a 24-hour rain storm event with a 25 year return period. Based on the rainfall standards for this area and as utilized in the Stormwater management report for Seven Hills, the rainfall quantity for the 24-hour rain storm event with a 25 year return period is approximately[ ] 6.2 inches. Thus based on the Act, the BMPs on the site should provide protection for rainfall[ ] events up to [ ] 6.2 inches. The so called "extreme" rain events that Dr. Nutter claims "overwhelmed" the BMPs are all below 3 inches, much lower than the 24-hour 25-year rainfall standard.
In his rebuttal of my report dated October 24, 2016, Dr. Nutter claims that the quantity of runoff generated from the lots would be "considerably less" than my report implies. Dr. Nutter fails to state that my assessment was based on conditions that existed both prior [to] and during my site visits of February and August 2016. Further, Mr. Baxter admits that during this period a second swale had to be installed around August 2016 due to ongoing problems with storm water in Unit D ....
Dr. Nutter suggests in his rebuttal that the BMPs installed on the site either prevented sediments from escaping the site or when they did escape [they] did not result in any significant accumulation. Here again, Dr. Nutter's rebuttal is refuted by Mr. Baxter who admitted that Paulding County official[s] ordered [the Forestar Defendants] to remove sediment from the tributary of Pumpkinvine Creek ....
According to Dr. Nutter, the inspection reports prepared by Gaia, Inc. do not reveal violations of the General Permit associated with the development of the subdivision Unit D. Dr. Nutter's opinions in this regard are refuted by an email exchange wherein Mr. Baxter acknowledged he had spoken with one of Gaia, Inc.'s principals, Stephen F. Modeka, in February 2016, who informed Mr. Baxter of numerous ongo ing erosion control violations over the entire subdivision.
*1327 Mr. Baxter further acknowledged that on January 6, 2016, he sent an email to various parties including L. Sparks, Mr. Vansant, Jeff Johnson, and Tiffany an administrative assistant at [Defendant] Forestar wherein he acknowledges ongoing erosion issues on the development.... Mr. Baxter's admissions identify a pattern of intermittent and ongoing violations of the applicable permits [the Forestar Defendants] obtained.
The review of additional documents produced in discovery coupled with Mr. Baxter's own sworn testimony further support the Opinions set forth in my FRCP 26 Expert Report dated October 25, 2016. Significantly, the foregoing demonstrates that [the Forestar Defendants] have knowingly violated the terms of the General Permit they received in connection with the development of the Seven Hills subdivision Units C and D. It is my expert opinion that [Defendants'] construction activities were conducted without the proper design, installation and maintenance of appropriate BMPs as required by the [CWA], the Georgia Water Quality Control Act, and the Georgia Erosion and Sedimentation Act of 1975.
(Wellington Suppl. Report at 3-7 (emphasis in original) (citations omitted).)
III. Discussion
A. The Parties' Positions
The Forestar Defendants seek to strike Dr. Wellington's Supplemental Report. (See generally Mot. Strike.) The Forestar Defendants argue that Dr. Wellington's Supplemental Report is not a proper supplementation under Federal Rule of Civil Procedure 26(e), as that rule allows supplementation only for the purpose of correcting inaccuracies or adding information that was not available when the initial report was issued. (Br. Supp. Mot. Strike (Docket Entry No. 81-1) at 7-10.) The Forestar Defendants further contend that the Supplemental Wellington Report contains improper and untimely rebuttal opinions. (Id. at 11-14.) The Forestar Defendants also argue that the Supplemental Wellington Report includes improper sur-rebuttals. (Id. at 14-16.) The Forestar Defendants contend that they will suffer harm if the Court allows Plaintiffs to present the Supplemental Wellington Report. (Id. at 16.) Finally, the Forestar Defendants argue that certain portions of the Supplemental Wellington Report are inadmissible legal conclusions and are subject to exclusion under Federal Rule of Evidence 702. (Id. at 17-20.)
In response, Plaintiffs argue that the Supplemental Wellington Report was timely under the Amended Scheduling Order and the Local Rules. (Resp. Mot. Strike (Docket Entry No. 84) at 2-6.) Plaintiffs also note that the Supplemental Wellington Report is not an untimely rebuttal. (Id. at 4.) Plaintiffs argue that they were simply required to disclose the opinions ninety days before trial, and claim that they complied with this requirement. (Id. at 4-5.) Plaintiffs also argue that the Supplemental Wellington Report is not an improper surrebuttal. (Id. at 6.) Plaintiffs contend that, even if the Supplemental Wellington Report is untimely, the untimely disclosure was harmless and did not prejudice the Forestar Defendants. (Id. at 7-10.) Finally, Plaintiffs argue that the statements in the Supplemental Wellington Report to which the Forestar Defendants object "are opinions on issues of fact," and contend that those opinions are not objectionable simply *1328 because they embrace an ultimate issue. (Id. at 10.)
The Forestar Defendants argue in their reply that Plaintiffs have erroneously interpreted the Amended Scheduling Order as allowing entirely new expert reports, even when the reports are not based on new information. (Reply Supp. Mot. Strike (Docket Entry No. 88) at 1.) The Forestar Defendants contend that Rule 26(e) does not allow Parties to use supplementary disclosures to permit their experts to conduct additional work or offer new opinions, and contend that the Wellington Supplemental Report is improper supplementation under Rule 26(e). (Id. at 4-6.) The Forestar Defendants argue that Plaintiffs have not met their burden to show that the delay in producing the Wellington Supplemental Report was substantially justified or harmless, and contend that they will suffer harm if the Court allows Plaintiffs to present this latest expert report. (Id. at 7-9.) The Forestar Defendants also argue that the rebuttal statements in the latest expert report are untimely because Dr. Wellington did not make those statements within thirty days after the Forestar Defendants served their expert report. (Id. at 9-11.) Further, the Forestar Defendants contend that the latest expert report is a sur-rebuttal, not a rebuttal, and is improper. (Id. at 12-13.) Finally, the Forestar Defendants complain that the latest expert report contains inadmissible legal conclusions. (Id. at 13-14.)
B. Discussion
" Rule 26(a)(2) of the Federal Rules, of Civil Procedure governs the disclosure of expert witnesses." Cochran v. Brinkmann Corp., No. 1:08-cv-1790-WSD, 2009 WL 4823858, at *4 (N.D. Ga. 2009). "It requires that a report, signed by the expert witness, must accompany the disclosure of each expert witness." Id."This report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authorized in the previous 10 years; (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." Id."A party must make these disclosures at the time and in the sequence that the court orders." Id. Under Federal Rule of Civil Procedure 26(e), "[a] party also must supplement or correct its disclosure 'in a timely manner if the party learns that in some material respect the disclosure ... is incomplete or incorrect.' " Id. (alteration in original) (quoting Fed. R. Civ. P. 26(e)(1).)
Further, under Federal Rule of Civil Procedure 37(c)(1), if "a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The nondisclosing party bears the burden of showing substantial justification or harmlessness. Cochran, 2009 WL 4823858, at *5.
Judge Duffey rejected an argument similar to that raised by Plaintiffs in this case. Cochran, 2009 WL 4823858, at *5. In that case, the plaintiffs' expert conducted additional testing, was deposed, and discovered shortcomings in the opinions he *1329 offered, which led him to conduct more testing. Id. at *5. The plaintiffs argued that they were entitled to supplement their expert's report under Rule 26(e) based on a contention that their expert's report was incomplete or inaccurate. Id. Judge Duffy observed:
This is a tortured and self-serving interpretation of what the Rule allows in an attempt to justify Plaintiffs' strategy to introduce opinions and evidence foreclosed by the orders of this Court. The purpose of expert reports and a deadline for serving them is to put an opposing party on notice of what it must contend with at trial. Plaintiffs' strategy of ongoing testing and report amendment defeats the purpose of the report requirement and the order of this Court, which was to end discovery and fix for the parties the evidence and opinions with which they would have to contend at trial so a trial court be fairly and efficiently conducted. That effort would be hopelessly and unfairly frustrated if the Court allowed Plaintiffs' tactic in this case. Rule 26(e) requires a party to supplement a report it finds was 'incomplete or inaccurate.' Fed.R.Civ.P. 26(e)(1)(A). It is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy.
Id. Judge Duffey also observed that " Rule 26(a) is clear that an expert's report must contain 'a complete statement of all opinions the witness will express,' 'the data or other information considered by the witness in forming them,' and 'any exhibits that will be used to summarize or support them.' " Id. at *6 (quoting Fed. R. Civ. P. 26(a)(2)(B) ). Judge Duffey noted:
Plaintiffs undeniably failed to comply with these requirements by adding opinions and exhibits, based on new testing unforecasted to Defendant and which was undertaken weeks and months after the December 5, 2008 deadline for Edmondson's expert report. Plaintiffs claim that they were required to make these additional disclosures as 'supplemental' disclosures under Rule 26(e), which provides that if a party learns that its disclosure is 'incomplete or incorrect,' it must supplement or correct it 'in a timely manner.' " Plaintiffs' twisted attempt to use Rule 26(E) to justify their untimely disclosures is unprecedented, and unfair.
Although Edmondson was retained months in advance of the expert report deadline, Edmondson failed to conduct the testimony upon which to formulate his expert report. Rule 26 does not permit a party to circumvent the deadlines imposed by the Court.
Id. at *6-7 (citations omitted). Judge Duffey ultimately concluded that "Plaintiffs' failure to conduct the testing and to offer the opinions based on the testing before the deadline for expert reports was not substantially justified nor were the late testing and disclosures harmless," and excluded the testing and the related supplemental report and testimony. Id. at *7 (footnote omitted).
Judge Duffey's ruling in Cochran is consistent with the positions taken by other courts, which find that Rule 26(e) is not an excuse to rewrite an expert report or present new opinions. See Beller ex rel. Beller v. United States, 221 F.R.D. 696, 701-02 (D.N.M. Nov. 10, 2003) (rejecting the plaintiffs' argument that Rule 26(e) permitted them to present an expert report containing new opinions and noting that "[t]o rule otherwise would create a system where preliminary reports could be followed *1330 by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given," which "would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions"); Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C. Dec. 20, 2002) ("The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions. Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading. It does not cover failures of omission because the expert did an inadequate or incomplete preparation. To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek [sic] havoc in docket control and amount to unlimited expert opinion preparation." (citations omitted)).
Further, at least one United States District Judge in this District has stricken an expert report as invalid supplementation even where the report was filed before the expert was deposed. Goshawk Dedicated Ltd. v. Am. Viatical Servs., LLC, Civil Action No. 1:05-CV-2343-RWS, 2013 WL 424891, at *3-4 (N.D. Ga. Feb. 4, 2013). In that case, Judge Story noted that the expert's report was not a supplement, as it dealt with completely new information. Id. at *4.[1]
The Court finds that the cases above are persuasive, and concludes that the Wellington Supplemental Report is not a proper supplemental report under Rule 26(e). The Court therefore must exclude the Wellington Supplemental Report unless Plaintiffs' failure to disclose it was substantially justified or harmless. Here, Plaintiffs have not shown substantial justification for the delay. Indeed, Plaintiffs waited approximately ten months to present the Wellington Supplemental Report, which appears to be based on information that was available, or should have been available, to Plaintiffs from a very early stage in the litigation. Under those circumstances, Plaintiffs cannot show substantial justification for the delay in presenting the Wellington Supplemental Report.
Further, the late disclosure is not, as Plaintiffs argue, harmless to the Forestar Defendants. Notably, Plaintiffs, not the Forestar Defendants, bear the burden of showing that the late disclosure was harmless. The Forestar Defendants will suffer harm if the Court allows the Wellington Supplemental Report, as they must expend resources responding to the new opinions in the report even if the Court waives the expert disclosure deadline and allows them to present a report from their expert in response to it. As it stands, that deadline has passed, and the Forestar Defendants would not have an opportunity to rebut the opinions in the Wellington Supplemental Report.
Moreover, the Forestar Defendants are correct in their contention that the *1331 rebuttal statements in the Wellington Supplemental Report are untimely. The deadline for disclosing a rebuttal report is ordinarily thirty days after the previous report is disclosed. See Fed. R. Civ. P. 26(a)(2)(D)(ii) ("Absent a stipulation or a court order, the disclosures must be made ... if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure."); see also Navajo Nation v. Urban Outfitters, Inc., No. 12CV0195 BB/LAM, 2016 WL 3475339, at *2 (D.N.M. Feb. 9, 2016) ("Since the Court did not set a deadline for rebuttal experts, and the parties did not stipulate to a deadline, the parties' deadline for disclosing rebuttal expert evidence was thirty days after the other party's disclosure."); Smetzer v. Newton, Cause No. 1:10-CV-93, 2012 WL 2064507, at *1 (N.D. Ind. June 7, 2012) ("[W]hen neither the Court nor the parties set a deadline for rebuttal expert reports, Rule 26(a)(2)(D)(ii) applies, requiring a plaintiff to serve any rebuttal report no later than thirty days after the defendant's expert disclosures" (collecting cases)). The Forestar Defendants served the expert report for their witness, Dr. Nutter, months ago. (Forestar Defs.' Second Initial Disclosures (Docket Entry No. 51-1) (filed on November 25, 2016).) The Wellington Supplemental Report is an untimely rebuttal because Plaintiffs failed to serve it within thirty days after the Forestar Defendants presented Dr. Nutter's report. See Navajo Nation, 2016 WL 3475339, at *2 (finding that a rebuttal report served more than five months after service of the expert report that it purported to rebut was untimely).[2] Moreover, a rebuttal report is limited to contradicting or rebutting evidence on the same subject matter identified by another party and is not an opportunity to advance new opinions or new evidence. Smetzer, 2012 WL 2064507, at *2 (collecting cases). Thus, Plaintiffs cannot use the rebuttal argument to admit completely new opinions from Dr. Wellington.
In any event, statements in the Wellington Supplemental Report that purport to rebut statements in the rebuttal report from Dr. Nutter are improper sur-rebuttal. Generally, sur-rebuttal reports are prohibited or require prior permission from the court. Louisiana Health Care Self Ins. Fund v. United States, Civil Action No. 12-766-JJB-RLB, 2014 WL 3720526, at *1 (M.D. La. July 25, 2014) (noting that Rule 26(a)(2)(D)(ii) did not grant a right to file a sur-rebuttal, stating the Rule did not prohibit sur-rebuttal reports, and observing that "a party wishing to provide a sur-rebuttal must first seek leave of Court") (collecting cases); Carroll v. Allstate Fire & Cas. Ins. Co., Civil Action No. 12-CV-00007-WJM-KLM, 2013 WL 3810864, at *6 (D. Colo. July 22, 2013) ("Sur-reply expert disclosures are not anticipated by the Federal Rules of Civil Procedure, this Court's Local Rules, or the Scheduling Order."). Plaintiffs did not seek permission from the Court to file a sur-rebuttal, and the Court excludes the sur-rebuttal portions of the Wellington Supplemental Report on this ground.
In any event, the Wellington Supplemental Report contains a number of legal conclusions, including statements that Defendants violated their permit or *1332 knowingly violated their permit. "Although experts may not testify to legal conclusions, testimony ... is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." United States v. Johnston, 322 Fed.Appx. 660, 667 (11th Cir. 2009). However, "courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (internal quotation marks and citation omitted). Dr. Wellington's statements that Defendants "violated" or "knowingly" violated their permit are legal conclusions, and are inadmissible. See United States v. Tonawanda Coke Corp., No. 10-CR-219S, 2013 WL 672280, at *9 (W.D.N.Y. Feb. 22, 2013) ("As for Defendants' request that the government be precluded from eliciting from its experts whether Defendants are guilty, that request is granted. But the government's witnesses may properly testify from their personal knowledge about what Defendants' permits required and whether the conditions required by the permits were observed at TCC. Those are factual observations, not conclusions of law."). Certainly, Dr. Wellington could testify about what Defendants' permits required and whether he observed the conditions required by the permits. What he cannot do, however, is testify that Defendants violated their permits or knowingly violated their permits, as those are legal conclusions. To the extent that he seeks to do so in the Wellington Supplemental Report, the statements are subject to exclusion.
For the reasons discussed above, the Court grants the Motion to Strike, and excludes the Wellington Supplemental Report. Plaintiffs may not present that report at trial.
IV. Conclusion
ACCORDINGLY, the Court GRANTS the Forestar Defendants' Motion to Strike [81], and excludes the Wellington Supplemental Report [78-1].
IT IS SO ORDERED, this the 11th day of October, 2017.

Notably, the "supplemental" expert report in that case was served five years after the original report was issued. Id.

The court in Navajo Nation ultimately denied a motion to strike the untimely rebuttal expert report, concluding that the failure was substantially justified and that the defendants had not demonstrated prejudice. Navajo Nation, 2016 WL 3475339, at *2-3.